**Frederick FRATIELLO, Plaintiff,**

**v.**

**Anthony MANCUSO, Chief of Police for the City of Providence; Detective George Dean; Detective Malcolm Brown; Sargeant Joseph Gleckman; Patrolman Robert Larkin; Patrolman James Rodger; Patrolman Orestes Fleitas; The City of Providence; and Stephen T. Napolitano, City Treasurer for the City of Providence, Defendants.**

**Civ. A. No. 84-0615 L.**

United States District Court,
D. Rhode Island,
First Division.

Feb. 12, 1987.

[redacted]

Sandra P. Blanding, Warwick, R.I., for plaintiff.

Allison L. Holm, Asst. City Sol., Providence, R.I., for defendants.

## OPINION

LAGUEUX, District Judge.

This matter is before the Court pursuant to 28 U.S.C. § 1343 (federal civil rights jurisdiction). Plaintiff Frederick Fratiello, alleging deprivation of his federal constitutional rights, seeks declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202; injunctive relief pursuant to 42 U.S.C. § 1983 and costs and attorney's fees under 42 U.S.C. § 1988. Defendant Colonel Anthony Mancuso is sued individually and in his official capacity as Chief of Police for the City of Providence. Defendants Dean, Brown, Gleckman, Larkin, Rodger and Fleitas were, at all relevant times, members of the Providence Police Department and are sued individually and in their official capacities as agents, servants, and employees of the defendant City of Providence. Defendant Steven T. Napolitano is sued in his official capacity as Treasurer for the City of Providence.

The instant action (a four count complaint) arises out of a series of arrests and threatened arrests, undertaken under color of law, to which plaintiff was allegedly subjected by the above-named members of the Providence Police Department. In Count I of his complaint, plaintiff asserts that such activities were conducted in bad faith, with the intent to harass plaintiff and to interfere with his exercise of his right of free speech as guaranteed by the First and Fourteenth Amendments to the United States Constitution. Count II alleges that the conduct of the police defendants was violative of plaintiff's Fourteenth Amendment right to equal protection of the laws. In Count IV, plaintiff contends that defendant Mancuso failed to adequately train, ed-

ucate, supervise and discipline the named defendant police officers and detectives. Plaintiff asserts that such failure resulted in denial of his federal constitutional rights as specified in Counts I and II. Additionally, in Count III of his complaint, plaintiff challenges §§ 3–4, 3–5, 16–3(c) and 16–10 of the Code of Ordinances of the City of Providence. Plaintiff contends that the ordinances are unconstitutionally vague and overbroad.

A trial on the merits in this jury-waived action was conducted by this Court in September 1986. Post-trial memoranda have been submitted by the parties and the matter is now in order for decision.

Plaintiff, a mechanical engineering graduate of Columbia University, is the founder of an organization known as the Proletarian Warriors (Warriors). At trial, plaintiff testified that the association's ultimate goal is the overthrow of the capitalist class. The Warriors advocate armed revolution, if necessary, as a means of accomplishing this objective. The organization seeks to disseminate its ideas to the public through the use of leaflets, banners, posters and bullhorns as well as by amplification of recorded music and sponsoring cultural events. On several occasions, such activities have resulted in contacts between plaintiff and members of the Providence Police Department.

For the last several years, plaintiff has sustained himself by doing menial labor, coming out of self-imposed exile every March or April in order to drum up support for the Warriors' annual May Day demonstration. His supporters, at one time, numbered as many as twelve, but in recent times, membership in the Warriors has diminished to only two or three persons. At trial, plaintiff was the only adherent to appear and espouse Proletarian Warrior philosophy.

Plaintiff testified that his first encounter with the Providence Police occurred in April 1982 when he and another member of the Warriors were affixing two-page paper leaflets, measuring approximately eight and one-half by eleven inches, to utility poles on Broad Street. The leaflets, in addition to articulating the organization's objectives and philosophy, invited the reader to attend a Warriors-sponsored International Workers' Day march and rally that was scheduled for May 1, 1982. Plaintiff testified that he and his companion were arrested and ultimately detained at the police station for approximately one-half hour by Detectives Dean and Brown. At the time, both detectives were members of the Providence Police Department's Terrorist and Extremist Suppression Team (TEST). Both plaintiff and Detective Dean testified that the pair was released from custody, without charges having been filed, after a telephone company representative stated that the company did not object to the attachment of leaflets to its utility poles.

Plaintiff's posting activities resulted in contacts with members of the Providence Police Department on several subsequent occasions. Plaintiff testified that on one occasion he and two companions were affixing Warriors leaflets to utility poles on Dexter Street when they were approached by police officers. The officers allegedly inquired as to whether the leaflets were "the communist stuff" and ordered cessation of posting efforts.

In August 1982, plaintiff and another person were engaged in similar activities on Broad Street. Plaintiff testified that he was detained at the scene, by being forced to stand "spread-eagled" against a police cruiser for approximately twenty minutes, by unidentified police officers. After the officers discarded the paste that plaintiff had been using to affix leaflets to utility poles, plaintiff was released but warned not to continue his posting activity.

In March 1983, plaintiff was arrested and charged with violation of § 3–4 of the Code of Ordinances for the City of Providence. Section 3–4 restricts the posting of notices within the occupation line of streets and highways. At the time of his arrest, plaintiff and a companion were again affixing to utility poles on Broad Street eight and one-half by eleven-inch leaflets explaining the

Warriors' views. The charge against plaintiff was ultimately dismissed.

In March 1984, plaintiff was affixing leaflets publicizing a musical event to utility poles on Camp Street when he was ordered to cease such efforts by Detective Dean and other police officers. The concert to which the advertisements referred was not sponsored by the Warriors and the leaflets contained no reference to the organization's views or activities.

Plaintiff further testified that on two other occasions, both in March 1985, he was threatened with arrest while engaging in Warriors-related posting. As a result of the series of arrests and threatened arrests to which he was subjected, plaintiff stated that he curtailed his leaflet-posting efforts.

Plaintiff testified that, at sometime prior to May 1, 1984, he had unsuccessfully sought municipal permission to affix leaflets to utility poles. Plaintiff stated that he first telephoned the office of the Commissioner of Public Safety. This office referred plaintiff to the Public Works Department. However, when plaintiff telephoned that division, he was informed that such matters were not within its jurisdiction. Plaintiff testified that he then wrote to the Public Works Committee of the City Council but that the Committee failed to respond to his request. A copy of plaintiff's letter to the Committee was admitted into evidence. However, the Committee Chairman, James Petrosinelli, testified that he had never received any requests, written or otherwise, from plaintiff.

Another encounter between plaintiff and members of the Providence Police Department occurred on April 14, 1982. At approximately 3:00 P.M., plaintiff and three other members of the Warriors, including one person who was carrying a red flag and two others who were distributing leaflets identical to those which plaintiff had posted earlier on Broad Street, marched along Westminster Mall to the intersection of Westminster and Dorrance Streets. There, using a bullhorn, plaintiff began to explain the organization's scheduled International Workers' Day activities to passers-

by. Plaintiff testified that, almost immediately, a mounted police officer, Patrolman Rodger, ordered him to cease use of the bullhorn. Officer Rodger informed plaintiff that use of such an amplification device without a permit was prohibited. Plaintiff, asserting that no such permit was necessary, refused to comply with the police officer's order. Instead, plaintiff addressed the crowd of onlookers that had gathered, inviting them to observe how fearful the police were of the Warriors' message.

Officer Rodger did not testify at trial. However, a transcript of his deposition testimony of September 13, 1983, with accompanying exhibits, was admitted into evidence without objection. Officer Rodger's testimony provides a different recollection of the events of April 14, 1982. At approximately 3:00 P.M. on that date, Officer Rodger was directing vehicular traffic at the intersection. He testified that plaintiff had been addressing passersby for approximately ten to fifteen minutes before he elected to intercede. Officer Rodger stated that he approached plaintiff only after a pedestrian complained that she was afraid to work her way through the crowd and was, thus, unable to enter a nearby bank.

Initially, Officer Rodger requested that plaintiff lower the volume of his bullhorn. However, plaintiff refused to do so. By this time, students from various secondary schools had disembarked from school buses in the immediate vicinity. Approximately 400 people had gathered around plaintiff, effectively preventing access to area business establishments. In fact, another pedestrian had complained that he was unable to enter a nearby restaurant.

Officer Rodger then informed plaintiff that the use of a bullhorn without a permit was prohibited and, accordingly, ordered cessation of such activity. Further, he requested that plaintiff and his companions disperse. Plaintiff refused to comply with either command. Instead, he allegedly urged the crowd to hurl missiles at and "revolt" against Officer Rodger, whom

plaintiff described as "the pig on the horse".

After Officer Rodger radioed for assistance, plaintiff and another member of the Warriors, Kevin Pitts, were arrested and charged with disorderly conduct in violation of R.I.Gen.Laws 1956 (1981 Reenactment) § 11–45–1. The charge against plaintiff resulted from his alleged use of loud and abusive language, which Officer Rodger claimed was offensive to passersby. As a result of his use of a bullhorn, plaintiff was also charged with violation of § 16–10, the City's "anti-noise" ordinance.

The disorderly conduct charge against plaintiff was subsequently dismissed. Plaintiff was adjudged guilty in the Providence Municipal Court of violation of § 16–10. At the time of this trial, an appeal of this conviction was pending in the Rhode Island Superior Court.

Plaintiff's trial testimony indicates that, in 1983, subsequent to being adjudged guilty of violation of § 16–10, he sought, unsuccessfully, to obtain a permit to use a bullhorn. Plaintiff first telephoned the office of the Commissioner of Public Safety which referred him to the City Solicitor's office. The City Solicitor's office advised plaintiff to contact the License Bureau. However, when plaintiff did so, the Bureau informed him that they did not issue licenses for such purposes. At trial, the parties stipulated that no municipal ordinance, rule or regulation requires the obtainment of a permit as a prerequisite to the use of a bullhorn. Plaintiff testified that, as a result of his inability to obtain such a permit and his fear of further arrest, he has ceased use of a bullhorn as a means of disseminating his ideas to the public.

On August 27, 1982, plaintiff was again arrested and charged with violation of § 16–10. On that date, plaintiff and two companions were present on Westminster Mall for the purposes of publicizing an upcoming Providence Civic Center concert by the rock group "Clash" and the Warriors' scheduled preconcert march from Thayer Street to the Civic Center. Officer Larkin, who was also present on the mall, testified that in addition to displaying a banner and leafletting, the trio was playing a radio at maximum volume. Plaintiff was addressing passersby by means of a bullhorn which also had been set at its maximum amplification level.

Despite repeated requests by Officer Larkin, plaintiff refused to lower the volume of either the radio or the bullhorn. As a result, the officer attempted to take the trio into custody. A struggle between plaintiff and Officer Larkin ensued. Officer Larkin testified that during the course of the altercation plaintiff verbally attempted to incite the crowd that had gathered to violence against the police.

After his arrest, plaintiff was referred to the TEST division at the request of Lieutenant Edmund R. Calcagni, who, at the time, was the director of TEST. Plaintiff was charged with playing of loud, prolonged music in violation of § 16–10. In addition, plaintiff was charged with violation of § 16–3(c), the City's disorderly conduct ordinance, for his alleged use of "anti-police slogans" and attempt to incite the crowd to react violently against the police. Plaintiff was ultimately adjudged not guilty of both charges.

During the summer of 1983, plaintiff was again charged with violation of § 16–10. On that occasion, plaintiff was playing a tape deck on Westminster Mall. Officer Larkin requested that he lower the volume but plaintiff refused. Accordingly, Officer Larkin issued a summons charging plaintiff with causing unnecessary noise. Plaintiff pleaded nolo contendere to the charge.

Certain contacts between plaintiff and members of the Providence Police Department have resulted from plaintiff's activities near the City's high schools. On April 29, 1982, at approximately 12 noon, plaintiff and two other members of the Warriors arrived at Central High School. The trio, intending to publicize the group's International Workers' Day activities, planned an outdoor distribution of leaflets to students, recitation of poetry and broadcast of recorded music.

The Principal of Central, Arthur M. Zarrella, observed the group as they walked across the school's plaza and proceeded onto Fricker Street, a public road which traverses the high school complex. Central's cafeteria and vocational school are located on the opposite side of Fricker Street from the school's main building. When school is in session, the street is blocked to all vehicular traffic from 8:15 A.M. until 2:45 P.M. Zarrella approached plaintiff, informed him that playing of music on school grounds was prohibited and requested that he and his companions leave the premises. However, plaintiff refused to comply. Instead, plaintiff proceeded along Fricker Street, stopping near the street's intersection with Broad Street. There, plaintiff displayed a Warriors' banner and began to explain the organization's philosophy.

By this time a large number of students had gathered around plaintiff. Plaintiff's arrival at the high school complex coincided with one of Central's three lunch periods. During each lunch period, approximately 600 students are present in the cafeteria vicinity. In addition, approximately 200 students from nearby Classical High School are in attendance. The principal again asked plaintiff to leave the area and plaintiff again refused. Zarrella then instructed one of the high school's assistant principals to summon police. Plaintiff continued to address the gathering, inviting the students to observe how the Principal was attempting to deprive him of his constitutional rights.

Detectives Dean and Gleckman, both members of the Police Department's TEST team, responded to the scene. Plaintiff refused to comply with the detectives' requests that he leave the premises. By this time, Central's last lunch period had ended and the entire student population was changing classes. According to Principal Zarrella, word had spread among the students that an incident was occurring on Fricker Street. Although they should have been attending classes, at least 150 to 200 students had gathered on the street. In addition, many others were watching from class room windows. Detective Dean testified that the Principal expressed concern that the students, who were agitated, were about to direct acts of violence toward plaintiff. Accordingly, Zarrella requested that plaintiff be removed from the premises.

Plaintiff was arrested after he refused to comply with repeated police requests to leave the area. Plaintiff was charged with trespass upon the premises of an educational institution in violation of R.I.Gen. Laws 1956 (1981 Reenactment) § 11–44–26; disorderly conduct in violation of § 11–45–1(b); and, disruption of a public school session, a violation of § 11–11–1. The trespass and disorderly conduct charges were subsequently dismissed. Plaintiff was adjudged guilty of the remaining charge by a judge of the Rhode Island District Court. At the time of trial in the instant matter, an appeal of that conviction was pending in the Rhode Island Superior Court.

On April 13, 1983, shortly before the scheduled commencement of the day's school session, plaintiff and two other members of the Warriors began distributing leaflets to students on the sidewalk in front of Hope High School. The leaflets detailed the Warriors' objectives and philosophy. Shortly after their arrival, the trio was approached by the school's acting Principal, John S. Hernandez, who requested that they leave the premises. By this time, a crowd of students had gathered around the group. At trial, Hernandez testified that he was concerned that student violence would ensue.

After the trio refused to comply with his request, Hernandez telephoned the police department. He was informed that the department had a "special squad" that would handle the matter. Uniformed officers as well as TEST members Dean and Gleckman responded to the scene. After multiple requests by the detectives that he leave the area, plaintiff did so.

Plaintiff's attempts to proselytize Warriors philosophy have resulted in contacts with police on other occasions as well.

Plaintiff testified that, on the day following the Central High School incident, he and other members of the Proletarian Warriors marched from the school to the downtown area of the City. The group attempted to display a banner and distribute leaflets on Westminster Mall. However, according to plaintiff's testimony, Officer Rodger informed him that he needed a permit to display the banner. Rather than face arrest, plaintiff ceased his activities.

On another occasion, during the spring of 1985, plaintiff was among a group of approximately 20–25 people who had gathered in a park on South Main Street, opposite the Providence County Courthouse. The group was broadcasting music over a sound system. Detective Dean was dispatched to the scene in response to a complaint that the music was disrupting proceedings in the Courthouse. Detective Dean requested that the volume be lowered and plaintiff complied.

Members of the Providence Police Department, including detectives assigned to the TEST unit, have also attended several Warriors-sponsored public functions such as parades and rallies. After certain events, those police officers who were in attendance prepared written accounts of the Warriors' activities.

For example, on May 1, 1982, the Warriors, after obtaining the requisite parade and park permits, conducted an International Workers' Day march and rally. The parade commenced at the intersection of Broad Street and Thurbers Avenue, proceeded along Broad Street and terminated at Burnside Park where speeches were delivered by the organization's members. At the direction of Colonel Mancuso, a police escort was provided and other Department personnel, including members of the TEST division, were present along the parade route. Detective Dean, Sargeant Gleckman, Officer Rodger and Sargeant John Zincone were among those police officers who were in attendance.

The parade and rally were conducted without incident. Afterward, Sargent Zincone, who at the time was senior officer of

the TEST team, prepared a written account of the events for Colonel Mancuso. His report included the names and addresses of five parade and rally participants, including plaintiff. Sargeant Zincone also provided the registration number and a description of an automobile operated by one of the participants. The account noted that the group "constantly belittled the government and Police calling for 'Revolution'."

On August 28, 1982, police officers including Detective Dean and Lieutenant Calcagni, who at the time was the director of TEST, attended the Warriors' pre-Clash-concert rally and march. Following a rally on Thayer Street, plaintiff and his group, escorted by police, paraded to the Providence Civic Center where they displayed a banner and distributed leaflets to concert-goers. Lieutenant Calcagni submitted a written report of the events, which were conducted without incident, to Colonel Mancuso. Lieutenant Calcagni noted that the organization's banner advocated the overthrow of the government. Plaintiff was the only person identified in the report.

The Warriors' May 1983 International Workers' Day march and rally was another event attended by police that became the subject of a written account. Detective Dean, who was among those police officers present, submitted a brief report of the day's events to Lieutenant Calcagni.

In Count I of his complaint, plaintiff alleges that the above-detailed encounters and certain other contacts that will be discussed below demonstrate a pattern of bad faith activity designed to harass plaintiff and interfere with his exercise of his First Amendment right of free speech. In substance, plaintiff alleges that the arrests and threatened arrests to which he was subjected were the result of official disagreement with the content of his speech and the substance of his beliefs.

In order to successfully assert a 42 U.S.C. § 1983 claim based upon a police officer's alleged bad-faith activity, a plaintiff must demonstrate that the conduct complained of, in fact, was undertaken in

bad faith and that such activity has resulted in a deprivation of a right secured to plaintiff by the constitution and laws of the United States. *See Landrigan v. City of Warwick,* 628 F.2d 736, 741 (1st Cir.1980) (quoting *Baker v. McCollan,* 443 U.S. 137, 140, 99 S.Ct. 2689, 2692, 61 L.Ed.2d 433 (1979)). Further, in order to impose liability upon a municipality for the unconstitutional acts of its police officers, a plaintiff must demonstrate that the conduct complained of was undertaken pursuant to a governmental policy. *City of Oklahoma City v. Tuttle,* 471 U.S. 808, 817, 105 S.Ct. 2427, 2433, 85 L.Ed.2d 791 (1985); *Monell v. Department of Social Services,* 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978). A municipality's liability is not limited to constitutional deprivations which implement or execute "a police statement, ordinance, regulation or decision officially adopted and promulgated by that body's officers" but includes unconstitutional activity "visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decision making channels." *Id.* at 690–91, 98 S.Ct. at 2036.

The record is devoid of any evidence of any plan or policy designed to interfere with plaintiff's exercise of his constitutional rights. There is no evidence that defendants' activities were the result of disapproval of, or in any way based upon the content of plaintiff's speech. In fact, plaintiff's own testimony was that defendants never expressed any objection to the content of his message. The encounters described at trial merely evince good-faith efforts by members of the Providence Police Department to maintain the peace and ensure public safety. Police officers are obligated to enforce the laws until and unless they are declared unconstitutional. "The enactment of a law forecloses speculation by enforcement officers concerning its constitutionality—with the possible exception of a law so grossly and flagrantly unconstitutional that any person of reason-

able prudence would be bound to see its flaws." *Michigan v. DeFillippo,* 443 U.S. 31, 38, 99 S.Ct. 2627, 2632, 61 L.Ed.2d 343 (1979).

Members of the Providence Police Department responded to Hope and Central High Schools only after receiving requests for assistance from school administrators. The testimony at trial demonstrates that plaintiff's activities on those occasions were disruptive to the educational process. Further, the testimony concerning plaintiff's attempts to proselytize in the Dorrance Street-Westminster Mall area of the City demonstrates that police activities on those occasions were not the result of any plan designed to interfere with plaintiff's exercise of his constitutional rights. According to Officer Rodger's deposition testimony, which this Court accepts as credible, he had never heard of plaintiff or the Warriors prior to the incident at the intersection of Westminster and Dorrance Streets. Officer Rodger intervened only after receiving complaints that the gathering was preventing access to nearby business establishments. Officer Rodger's requests, initially that plaintiff lower the volume of his bullhorn and, ultimately, that he cease use of the device, were based on his good-faith belief that plaintiff's activities were in violation of City ordinances prohibiting unnecessary noise and the use of such an amplification device without a permit. Such requests were not the result of any objection to the content of plaintiff's speech.[1]

Similarly, in requesting that plaintiff lower the volume of his bullhorn and radio on one occasion and his tape deck on another, Officer Larkin was merely following the directive of his superiors that the City's anti-noise ordinance, § 16–10, be enforced. Standard police procedure was to request that individuals playing loud radios in the Westminster Mall area lower the volume. Officer Larkin made such requests on a daily basis. Officer Larkin testified that in

---

1. According to plaintiff's testimony, on a subsequent occasion Officer Rodger informed plaintiff that display of a banner on Westminster Mall without a license was prohibited. Assuming plaintiff's version of the facts to be correct, such an event does not evince bad faith-conduct.

approaching plaintiff his sole concern was with the volume level plaintiff had chosen to employ and not with the content of plaintiff's speech.

On a number of occasions, plaintiff was subjected to police interference in his attempts to affix leaflets to utility poles. However, a review of the evidence presented regarding these events fails to suggest that defendants' conduct was in furtherance of any plan or scheme designed to inhibit plaintiff's exercise of his constitutional rights. Rather, the activities complained of were merely good-faith, content-neutral attempts to enforce §§ 3–4 and 3–5 of the City's Code of Ordinances. Plaintiff's testimony that on one occasion an unidentified police officer referred to the leaflets that plaintiff was posting as "communist stuff" does not require a contrary conclusion.

At trial, plaintiff detailed certain other encounters with members of the Providence Police Department that he alleges are indicative of a plan of harassment. Although a further discussion of these events is unnecessary, such encounters included an unsuccessful search of plaintiff's residence in pursuit of runaway juveniles. Plaintiff also alleged that on a subsequent occasion he was assaulted by three police officers. Further, plaintiff testified that he believed that he had been followed on two occasions by members of the Providence Police Department. Having examined the testimony concerning these events, the Court is satisfied that the alleged events do not evince any plan designed to interfere with plaintiff's exercise of his constitutional rights.

That certain charges filed against plaintiff were ultimately dismissed and that on one occasion plaintiff was detained at the police station but later released without being charged, do not suggest bad-faith conduct by members of the Providence Police Department. The Court of Appeal's reasoning in *Grandco Corp. v. Rochford,* 536 F.2d 197 (7th Cir.1976), is equally applicable to the instant matter.

In *Grandco,* plaintiffs challenged the facial validity of a municipal theater-licensing ordinance under which they had been subjected to multiple prosecutions. The District Court, finding that the ordinance was facially unconstitutional, granted declaratory and injunctive relief. State criminal proceedings pursuant to the ordinance had been pending against plaintiffs since prior to the commencement of the action. However, the Court concluded that, because of evidence of official harassment in the enforcement of the ordinance, issuance of such relief was not contrary to the doctrine of federal equitable restraint articulated by the Supreme Court in *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). The Court of Appeals, in finding that plaintiffs had failed to demonstrate harassment sufficient to permit federal equitable intervention, distinguished cases in which multiple prosecutions had been uniformly unsuccessful from the matter before it where at least some of the charges had been successfully prosecuted. Evidence of multiple prosecutions, by itself, is insufficient to infer that municipal officials were enforcing a challenged statute in bad faith and for purposes of harassment. *Grandco,* 536 F.2d at 203–04.

The fact that police officers, at the direction of Colonel Mancuso or other superiors, attended several Warriors functions and in some instances prepared written accounts of the events observed is not indicative of any scheme to interfere with plaintiff's exercise of his constitutional rights. The testimony presented clearly indicates that the objective of police presence was not to monitor or inhibit the political activities of plaintiff or his organization. Rather, members of the Department were in attendance for the sole purpose of performing their unquestionably legitimate functions of maintaining the peace and ensuring public safety.

In his deposition testimony, Officer Rodger stated that he was assigned to the Warriors' May 1, 1982 march and rally in order to ensure that vehicular traffic flowed smoothly along the parade route. The marchers' route included Broad Street,

a major traffic artery. Previously, Officer Rodger had been assigned to perform the same functions during the course of parades sponsored by other organizations.

Detective Dean testified that, at the direction of his superiors, he had attended several of the Warriors' public functions. He described the purpose of his presence at such events as being to maintain the peace. Prevention of violence, not suppression of the Warriors' lawful activities was his only responsibility. He attended and performed similar duties at events sponsored by other organizations. Sargeants Gleckman and Zincone provided a similar description of their responsibilities. Sargeant Gleckman noted that he was directed to attend public events conducted by various organizations whenever his presence was determined to be necessary to prevent violence or to provide security for participants.

The fact that certain police officers who attended the Warriors' public events and responded to complaints involving plaintiff were members of TEST is completely irrelevant. The duties of TEST personnel include investigation of religious, racially, ethnically or politically-motivated crimes. Division members are also expected to assist in non-TEST-related matters. Members of the Department's various units, including TEST, are utilized wherever necessary. Such personnel assignments lie within the Department's discretion.

Finally, that some of the Warriors' leaflets were retained on file in TEST's office does not evince any plan to harass plaintiff or interfere with his exercise of his constitutional rights. There is no evidence that the content of the documents retained served as the basis for any police activity.

In summary, the activities of all police defendants, whether viewed individually or collectively, do not evince bad-faith conduct designed to interfere with plaintiff's exercise of his constitutional rights.

In Count IV of his complaint, plaintiff contends that the Chief of Police, Colonel Mancuso, failed to adequately train, educate, supervise and discipline the individually named defendant police officers.

Plaintiff alleges that such failure has resulted in a denial of the rights secured to him by the First and Fourteenth Amendments to the United States Constitution.

■ In order to successfully pursue a § 1983 claim based on a police chief's alleged failure to adequately train or supervise subordinate police officers, plaintiff must provide proof of gross negligence amounting to deliberate indifference. Proof of simple negligence is insufficient to impose liability on either the police chief or the municipality. *Voutour v. Vitale,* 761 F.2d 812, 820 (1st Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 879, 88 L.Ed.2d 916 (1986). Further, such conduct must be the proximate cause of the subordinate's violation of plaintiff's civil rights. *Id.*

■ Plaintiff has failed to provide any evidence to support his claim of inadequate supervision and discipline. The minimal evidence presented on the subject indicates that the police officers were adequately trained. The police officers' training included attendance at the police academy and extensive "on-the-job" training. In addition, certain of the individually named officers indicated that they had completed courses in and attended seminars concerning law-enforcement-related subjects. Although Department members received no additional formal training upon their assignment to the TEST division, there is no indication that any such instruction was necessary. Those officers so assigned were experienced members of the Department who brought with them the skill and expertise which they had acquired throughout the course of their tenure with the Providence Police. TEST members remained subject to the same departmental rules and regulations.

In Count II of his complaint, plaintiff alleges that he was subjected to disparate treatment by defendants, in denial of his Fourteenth Amendment right to equal protection of law. Plaintiff contends that, unlike the Warriors, other organizations were permitted to freely assemble with displays and engage in the distribution of handbills.

■ It is well settled that under both the First Amendment and the equal protection clause of the Fourteenth Amendment, government may not restrict use of a forum to those persons or organizations whose views it finds acceptable. Rather, "government must afford all points of view an equal opportunity to be heard." *Police Department of City of Chicago v. Mosley*, 408 U.S. 92, 96, 92 S.Ct. 2286, 2290, 33 L.Ed.2d 212 (1972).

■ The Court concludes that the record fails to support plaintiff's assertion. The only evidence that in any way suggests that plaintiff and his organization were subjected to disparate treatment is the testimony of Steven Brown, the Executive Director of the Rhode Island affiliate of the American Civil Liberties Union. Brown testified that, since 1972, he has heard and observed various persons and organizations use amplification devices in the Westminster Mall area without police interference. Although, as will be discussed later, such testimony demonstrates the potential for abuse inherent in § 16–10, the Court does not find such testimony to be indicative of the selective enforcement of city ordinances alleged by plaintiff.

In Count III of his complaint plaintiff challenges the facial validity of §§ 3–4, 3–5, 16–3(c) and 16–10 of the Code of Ordinances of the City of Providence. Plaintiff contends that all four ordinances are unconstitutionally vague and overbroad.

Defendants assert that plaintiff lacks standing to maintain such a challenge to §§ 3–4 and 3–5. Both ordinances govern the posting and display of signs, bills, posters and notices within or upon the occupation line of any street or highway. The provisions require obtainment of municipal approval as a prerequisite to engagement in such activity. Defendants contend that plaintiff has not sought to engage in the type of conduct which they interpret the provisions to address, has not sought the requisite municipal approval to engage in such activity and has not been charged with violation of either ordinance.

■ Defendants' argument is without merit for two reasons. First, at trial plaintiff detailed several encounters with members of the Providence Police Department in which police officers ordered cessation of his postering activities. Plaintiff complied with such instructions. Therefore, although plaintiff was never charged with violation of either ordinance, it is obvious that his First Amendment activities were interrupted as a result of police enforcement of the two provisions.

■ Second, the ordinances operate as prior restraints on the exercise of the right of freedom of speech guaranteed by the First Amendment. Plaintiff contends that §§ 3–4 and 3–5 vest the licensing authority with unbridled discretion to deny, approve, or make approval of a permit application contingent upon whatever conditions the licensor elects to impose. It is well settled that in such circumstances facial challenges are permitted. *E.g., Hynes v. Mayor and Council of Borough of Oradell*, 425 U.S. 610, 96 S.Ct. 1755, 48 L.Ed.2d 243 (1976); *Shuttlesworth v. City of Birmingham, Ala.*, 394 U.S. 147, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969); *Thornhill v. State of Alabama*, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093 (1940); *Strasser v. Doorley*, 432 F.2d 567 (1st Cir.1970). A challenger need not demonstrate that he has made any effort to comply with the statute or that, had he attempted to do so, his application would have been refused. *Staub v. City of Blaxley*, 355 U.S. 313, 319, 78 S.Ct. 277, 280, 2 L.Ed.2d 302 (1958); *Thornhill*, 310 U.S. at 97, 60 S.Ct. at 741; *Strasser*, 432 F.2d at 568.

■ Although defendants do not contend otherwise, it is evident, for reasons similar to those set forth above, that plaintiff possesses standing to challenge the facial validity of §§ 16–3(c) and 16–10. Plaintiff contends that his right of freedom of speech was abridged by defendants' application of the ordinances. In addition, an overbroad statute may be challenged on its face regardless of whether a more narrowly-drawn statute would be valid as applied to the party asserting the challenge. *E.g.,*

*Members of City Council of City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 798–99, 104 S.Ct. 2118, 2125–26, 80 L.Ed.2d 772 (1984). Such a relaxation of the general standing rule is predicated on the assumption that the very existence of overbroad statutes, like vague laws, may cause others not before the court to refrain from constitutionally-protected speech or expression. *Id.* 104 S.Ct. at 2126 (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 612, 93 S.Ct. 2908, 2916, 37 L.Ed.2d 830 (1973)); *Grayned v. City of Rockford*, 408 U.S. 104, 108–09, 92 S.Ct. 2294, 2298–99, 33 L.Ed.2d 222 (1972).

Satisfied that plaintiff has standing sufficient to maintain his challenge to the facial validity of §§ 3–4 and 3–5, the Court now commences an examination of the merits of plaintiff's contentions. In view of the similarity of the two provisions and the likeness of their constitutional infirmities, a consolidated discussion of §§ 3–4 and 3–5 is appropriate.

The ordinances provide as follows:

Sec. 3–4. Posting, affixing, bills, posters, signs, notices to structures.

No person shall post or otherwise affix, nor cause to be posted or affixed, any bill, poster, or notice upon any tree, fence, post, pole or Rhode Island Public Transit Authority Bus Shelters, or other structures within or upon the occupation line of any street or highway; and, no person shall paint, print, mark, or cause to be painted, printed or marked, any sign, notice or advertisement upon any tree, fence, board, post, pole or Rhode Island Public Transit Authority Bus Shelter or other structure within or upon the occupation line of any street or highway, *except with the approval, in writing, of the committee on public works of the city council and subject to conditions*

*as said committee may impose respecting the same.* (Emphasis added)

Sec. 3–5. Erection, display of bills, posters, signs, notices on highway.

No person shall erect, place or display any sign, notice or advertisement, within or upon the occupation line of any street or highway, *except with the written approval of the commissioner of public safety, and subject to such written conditions as he may impose;* provided that nothing herein shall preclude permission to erect signs as permitted by the building code and zoning ordinance. (Emphasis added)

Sections 3–4 and 3–5 prohibit engaging in the activities specified without obtaining prior permission from the appropriate municipal authority. Both sections expressly provide that approval may be made subject to such conditions as the licensor may elect to impose.[2]

▪▪▪ It is a basic principle of due process that a law is void for vagueness if it does not clearly define the conduct that is prohibited. *Grayned,* 408 U.S. at 108, 92 S.Ct. at 2298. Further, in order to prevent arbitrary and discriminatory enforcement, the enactment must provide explicit standards to guide those charged with its application and enforcement. *Smith v. Goguen,* 415 U.S. 566, 572–73, 94 S.Ct. 1242, 1246–47, 39 L.Ed.2d 605 (1974); *Grayned,* 408 U.S. at 108, 92 S.Ct. at 2298. Public posting and display of signs, notices and the like indisputably serve as methods of communication of ideas. Therefore, §§ 3–4 and 3–5, which regulate such activities, impact upon the exercise of First Amendment rights. *See Taxpayers for Vincent,* 466 U.S. at 803, 104 S.Ct. at 2128; *Metromedia, Inc. v. City of San Diego,* 453 U.S. 490, 501–02, 101 S.Ct. 2882, 2889–90, 69

**2.** In their post-trial memorandum, defendants assert that the approval requirements set forth in § 3–4 are applicable only to painting, printing or marking of signs, notices or advertisements upon the structures enumerated. In substance, defendants interpret that portion of § 3–4 which governs posting or affixing of bills, posters or notices as an absolute prohibition of such activity and therefore not subject to the

approval provisions of the ordinance. This Court, however, rejects such a construction. Section 3–5 clearly subjects the placement of signs, notices or advertisements within or upon the highway occupation line to the licensing requirements set forth therein. To accept the interpretation of § 3–4 suggested by defendants would render that provision inconsistent with § 3–5.

L.Ed.2d 800 (1981). A law which subjects the exercise of First Amendment freedoms to the prior restraint of a license without providing narrow, objective and definite standards to guide the licensing authority is unconstitutional. *Shuttlesworth*, 394 U.S. at 150–51, 89 S.Ct. at 938–39.

Sections 3–4 and 3–5 are completely devoid of any standards to guide the licensor in deciding whether to issue a permit. The licensing authority has complete, unbridled discretion to deny or approve an application, or to render approval subject to whatever conditions it may elect to impose. Although the ordinances are facially content-neutral, the vesting of such complete discretion in the licensor invites determinations of permit requests based upon official approval or disapproval of the content of the applicant's message. The grant of such uncontrolled discretion "sanctions a device for suppression of free communication of ideas." *Saia v. People of State of New York*, 334 U.S. 558, 562, 68 S.Ct. 1148, 1150, 92 L.Ed. 1574 (1948). The absolute discretion afforded to the licensor by §§ 3–4 and 3–5 is exactly that which has been condemned by the United States Supreme Court on numerous occasions as an unconstitutional censorship of, or prior restraint upon the exercise of First Amendment freedoms. *E.g., Mosley*, 408 U.S. at 97, 92 S.Ct. at 2291; *Shuttlesworth*, 394 U.S. at 151, 89 S.Ct. at 938; *Staub*, 355 U.S. at 322, 78 S.Ct. at 282.

Although it may have been constitutionally permissible for the City to simply prohibit all activities enumerated in the ordinance within the occupation line of streets or highways,[3] it did not elect to do so. Instead, the Providence City Council vested its licensing authorities with complete discretion to allow or prohibit such activity. Accordingly, both § 3–4 and 3–5 are unconstitutionally vague.

In contending that § 3–4 does not vest the Committee on Public Works with excessive discretion, defendants rely, in part, on the trial testimony of the Committee Chairman, James Petrosinelli. He testified that the entire City Council makes the final decision on any permit request and the Committee's determinations serve merely as recommendations to the full Council. However, assuming, *arguendo*, that such a procedure is in fact employed, the City has failed to demonstrate that any standards exist to guide the Council in rendering its determination. The bald assertion that adequate guidelines exist within the City's Code of Ordinances and the Rhode Island General Laws is both unsupported and insufficient.

In March 1986, the Commissioner of Public Safety purported to promulgate and enact guidelines which further define the requirements of § 3–5. That promulgation, entitled *"Guidelines for the Erection, Display of Bills, Posters, Signs, Notices on Highways* (Providence Ordinance § 3–5)", restricts the height, size, location and manner of attachment of signs which extend or project over any sidewalk or street. Defendants contend that these guidelines sufficiently limit the Commissioner's discretion to approve or reject applications made pursuant to § 3–5. The Court finds this argument to be unpersuasive.

Any restraint on the Commissioner's discretion which the guidelines may provide is illusory. The guidelines were adopted by the Commissioner himself who, at his discretion, remains free to modify or eliminate them at any time and for any reason. Any prior restraint of expression bears a heavy presumption against its constitutional validity. *Organization for a Better Austin v. Keefe*, 402 U.S. 415, 419, 91 S.Ct. 1575, 1577, 29 L.Ed.2d 1 (1971); *Carroll v. President and Commissioners of Princess Anne*, 393 U.S. 175, 181, 89 S.Ct. 347, 351, 21 L.Ed.2d 325 (1968); *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70, 83 S.Ct. 631, 639, 9 L.Ed.2d 584 (1963). Defendants have failed to demonstrate the existence of policies and procedures suffi-

---

**3.** *See Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984); *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981).

cient to eliminate the constitutional infirmity. *See International Society for Krishna Consciousness, Inc. v. Rochford*, 585 F.2d 263 (7th Cir.1978).

In challenging the facial validity of §§ 3–4 and 3–5, plaintiff also contends that the provisions are overbroad. However, plaintiff has failed to enlighten this Court as to the basis for this assertion. Plaintiff's challenge to §§ 3–4 and 3–5 apparently is based entirely on the excessive discretion which the provisions vest in the licensor. In any event, the Court is satisfied that it does not have to consider this issue because those ordinances are facially unconstitutionally vague.

■■■ Section 16–10, the City's "anti-noise" ordinance provides:

Noise—Prohibited generally.

It is hereby declared to be a nuisance and it shall be unlawful for any person to make, cause or suffer or permit to be made or caused upon any premises owned, occupied or controlled by him, or upon any public street, alley or thoroughfare in the city unnecessary noises or sounds by means of the human voice, or by any other means or methods which are physically annoying to persons, or which are so harsh, or so prolonged or unnatural, or unusual in their use, time and place as to occasion physical discomfort, or which are injurious to the lives, health, peace and comfort of the inhabitants of the city.

The ordinance, by its terms is clearly applicable to speech.[4] Although we cannot expect mathematical certainty from our language, *Grayned*, 408 U.S. at 110, 92 S.Ct. at 2300, an examination of the ordinance in its entirety leads to the inescapable conclusion that the provision is unconstitutionally vague.

The ordinance, by prohibiting "unnecessary noises or sounds * * * which are physically annoying", fails to provide the

requisite clear notice of what is prohibited. *See Coates v. City of Cincinnati*, 402 U.S. 611, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971); *Jim Crockett Promotion, Inc. v. City of Charlotte*, 706 F.2d 486 (4th Cir.1983). As a result, persons of "common intelligence must necessarily guess at its meaning and differ as to its application." *Connally v. General Const. Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926). Attempts to comply with or to enforce the ordinance require application of a completely subjective standard. Where, as does § 16–10, a vague statute abuts upon the area of the First Amendment, it "'operates to inhibit the exercise of [those] freedoms.' Uncertain meanings inevitably lead citizens to 'steer far wider of the unlawful zone * * than if the boundaries of the forbidden areas were clearly marked.'" *Grayned*, 408 U.S. at 109, 92 S.Ct. at 2299 (quoting *Baggett v. Bullitt*, 377 U.S. 360, 372, 84 S.Ct. 1316, 1322, 12 L.Ed.2d 377 (1964); *Cramp v. Board of Public Instruction*, 368 U.S. 278, 287, 82 S.Ct. 275, 280, 7 L.Ed.2d 285 (1961) and *Speiser v. Randall*, 357 U.S. 513, 526, 78 S.Ct. 1332, 1342, 2 L.Ed.2d 1460 (1958)).

Provision of clear and explicit standards to guide law enforcement officers and triers of fact in their application of the ordinance are necessary to prevent arbitrary and discriminatory enforcement. *Smith v. Goguen*, 415 U.S. at 573, 94 S.Ct. at 1247; *Grayned*, 408 U.S. at 108, 92 S.Ct. at 2298. Section 16–10 subordinates the exercise of First Amendment freedoms to a police officer's entirely subjective determination of whether an actor's speech is "unnecessary" and "annoying". The grant of such unbridled discretion invites the suppression of ideas. *Saia*, 334 U.S. at 562, 68 S.Ct. at 1150. The ordinance provides a means of preventing discussion of unpopular, controversial or unorthodox views. "Annoyance at ideas can be cloaked in annoyance at sound." *Id.*

---

**4.** The situation here is different from that presented in *State v. Tavarozzi*, 446 A.2d 1048 (R.I.1982). In *Tavarozzi*, defendant, in appealing a disorderly conduct conviction contended, *inter alia*, that the applicable state statute, R.I.

Gen.Laws 1956 (1981 Reenactment) § 11–45–1(b), was unconstitutionally vague. The Rhode Island Supreme Court found it unnecessary to address the issue because it construed the provision as inapplicable to speech.

■ In addition, § 16–10 is unconstitutionally overbroad. An enactment will be declared facially invalid if it includes within its prohibitions expression that is protected by the First and Fourteenth Amendments. *E.g., Grayned,* 408 U.S. at 114, 92 S.Ct. at 2302; *Gooding v. Wilson,* 405 U.S. 518, 521, 92 S.Ct. 1103, 1105, 31 L.Ed.2d 408 (1972); *Coates,* 402 U.S. at 614, 91 S.Ct. at 1688. Certain limited categories of speech, such as obscenity and "fighting words", may be proscribed. *Chaplinsky v. State of New Hampshire,* 315 U.S. 568, 571–72, 62 S.Ct. 766, 769, 86 L.Ed. 1031 (1942).

However, the prohibitory reach of § 16–10 extends beyond such narrowly-defined classes of unprotected expression. The ordinance forbids all "unnecessary noise or sounds by means of the human voice * * * which are physically annoying to persons." Public discourse may not be prohibited simply because it may be deemed unnecessary and/or annoying to the listener. *See Cohen v. California,* 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971). Although the ordinance has a substantial deterrent effect on protected expression, § 16–10 has neither been afforded a narrowing construction by the state courts sufficient to limit its application to unprotected expression nor is the provision readily susceptible to such an interpretation. *Cf. Chaplinsky v. State of New Hampshire,* 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942) (Court upheld a statute which prohibited the use of "offensive, derisive or annoying word[s]" in public. The statute had been construed by the New Hampshire Supreme Court so as to forbid only "fighting words".)

Further, defendants' contention that the ordinance constitutes a permissible, content-neutral regulation of the manner of exercise of First Amendment privileges is without merit.

The First Amendment does not vest citizens with an absolute right to speak whenever and wherever they choose. *Cohen,* 403 U.S. at 19, 91 S.Ct. at 1785. It is well settled that a municipality is permitted to enact reasonable time, place and manner restrictions applicable to all speech irrespective of content. *E.g., Erznoznik v. City of Jacksonville,* 422 U.S. 205, 209, 95 S.Ct. 2268, 2272, 45 L.Ed.2d 125 (1975).

However, § 16–10 fails to meet this requirement of content-neutrality. The ordinance does not, for example, simply prescribe a maximum decibel level. Rather, by prohibiting "unnecessary noises or sounds * * * which are physically annoying to persons," § 16–10 selectively proscribes a certain category of speech; that which the listener views as "annoying." Such a subjective content-based restriction invites suppression of unpopular ideas.

Although selective restrictions on speech have been upheld in limited circumstances such as "when the speaker intrudes upon the privacy of the home * * * or the degree of captivity makes it impractical for the unwilling viewer or auditor to avoid exposure," *Erznoznik,* 422 U.S. at 209, 95 S.Ct. at 2272 (citing *Rowan v. Post Office Dept.,* 397 U.S. 728, 90 S.Ct. 1484, 25 L.Ed.2d 736 (1970) and *Lehman v. City of Shaker Heights,* 418 U.S. 298, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974)), the ordinance at issue has neither been alleged nor demonstrated as necessary to further such interests. "The ability of government, consonant with the Constitution, to shut off discourse solely to protect others from hearing it is * * * dependent upon a showing that substantial privacy interests are being invaded in an essentially intolerable manner. Any broader view of this authority would effectively empower a majority to silence dissidents simply as a matter of personal predilections." *Cohen,* 403 U.S. at 21, 91 S.Ct. at 1786.

■ Finally, plaintiff challenges the facial validity of § 16–3(c) alleging that the ordinance is impermissibly vague and overbroad. The provision provides in pertinent part as follows:

Disorderly and indecent conduct.

Any person who engages in conduct which violates any of the following subsections thereby commits disorderly conduct:

* * * * * *

(c) Any person who shall in a public place use "fighting words" or offensive language or words which by their very utterance inflict injury or are likely to provoke a violent reaction on the part of the average person so addressed;

In substance, plaintiff contends that § 16–3(c), by use of the phrase "offensive language", includes protected speech within its prohibitions.

Having examined the provision in its entirety, the Court concludes that § 16–3(c) is reasonably susceptible to only one interpretation. Not all offensive language is proscribed. Rather, the ordinance's prohibitory reach extends only so far as to prohibit "words which by their very utterance inflict injury or are likely to provoke a violent reaction on the part of the average person so addressed." Such language, commonly referred to as "fighting words", may constitutionally be proscribed. *Cohen,* 403 U.S. at 20, 91 S.Ct. at 1785; *Chaplinsky,* 315 U.S. at 572, 62 S.Ct. at 769.

Accordingly, because the Court concludes that the ordinance is not susceptible to application to protected expression, plaintiff's overbreadth challenge must fail. Similarly, the Court is satisfied that § 16–3(c) provides sufficient notice of the conduct proscribed and therefore concludes that the ordinance is not unconstitutionally vague. *See Chaplinsky,* 315 U.S. at 573–74, 62 S.Ct. at 770.

In summary, with regard to Count I of plaintiff's complaint, the evidence falls far short of demonstrating that defendants Mancuso, Dean, Brown, Gleckman, Larkin, Rodger and Fleitas, either individually or pursuant to any departmental policy, acted in bad faith or with an intent to interfere with plaintiff's exercise of his federal constitutional rights. In fact, there is no evidence of any involvement of Officer Fleitas in any of the activities complained of. The only apparent involvement of Colonel Mancuso is that he directed members of the Police Department to attend certain public events sponsored by the Warriors. There is no evidence that he did so with any intention of inhibiting plaintiff's exercise of his First Amendment rights.

Plaintiff has also failed to sustain his burden of proving that defendants abridged his Fourteenth Amendment right to equal protection of law as he alleges in Count II of his complaint. Further, plaintiff has failed to present any evidence in support of his claim, as set forth in Count IV of the complaint, that the defendant Mancuso failed to adequately train, educate, supervise and discipline defendants Dean, Brown, Gleckman, Larkin, Rodger and Fleitas.

Accordingly, judgment in favor of all defendants shall be entered on Counts I, II and IV of plaintiff's complaint. The only remaining claim, Count III, involves a challenge to the facial validity of four city ordinances. Therefore, all defendants, with the exception of the City of Providence and the City Treasurer, are hereby dismissed as defendants in the action.

Concerning Count III, the Court finds that §§ 3–4, 3–5 and 16–10 of the Code of Ordinances of the City of Providence are facially invalid. The Court hereby declares that §§ 3–4 and 3–5 are unconstitutionally vague and that 16–10 is both unconstitutionally vague and overbroad, and, therefore, said ordinances impermissibly impinge on the right of freedom of speech guaranteed by the First and Fourteenth Amendments to the United States Constitution. However, the Court concludes that § 16–3(c) does not suffer from the constitutional infirmities alleged by plaintiff.

In view of the Court's above declaration, issuance of injunctive relief barring enforcement of, or continuation or institution of any prosecution pursuant to §§ 3–4, 3–5 or 16–10 is unnecessary. Therefore, plaintiff's prayer for permanent injunctive relief is denied.

 Since plaintiff is the "prevailing party" on some of the claims made in this case, he is entitled to some costs and an award of some counsel fees under 42 U.S.C. § 1988. Any motion for such costs including counsel fees shall be made within twenty (20) days of this decision. The ap-

plication for counsel fees must be supported by a detailed, contemporaneous accounting of the time spent by the attorneys on this case. *Grendel's Den, Inc. v. Larkin,* 749 F.2d 945, 952 (1st Cir.1984).

Within ten (10) days of this decision, counsel for each side shall draft and submit a proposed form of judgment to the Court for its consideration.

IT IS SO ORDERED.